ARTURO J. GONZALEZ (CA SBN 121490)
AGonzalez@mofo.com
JESSICA L. GRANT (CA SBN 178138)
JGrant@mofo.com
ROBERT S. SANDOVAL (CA SBN 311032)
RSandoval@mofo.com
MALLORY MORALES (CA SBN 324094)
MMorales@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALTER W. WELLS and SCOTT MCFARLANE,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF STANISLAUS; CITY OF MODESTO; CITY OF CERES; STANISLAUS COUNTY OFFICE OF THE DISTRICT ATTORNEY; KIRK BUNCH; JON EVERS; DALE LINGERFELT; STEVE JACOBSON; BIRGIT FLADAGER; CORY BROWN; and DEREK PERRY,<br><br>Defendants. | Case No.<br><br>_____<br><br>**COMPLAINT FOR VIOLATIONS OF THE FOURTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983); FALSE ARREST AND IMPRISONMENT; MALICIOUS PROSECUTION UNDER STATE AND FEDERAL LAW; AND INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**<br><br>**[JURY TRIAL DEMANDED]** |

1

## INTRODUCTION

2      1.      Government officials—whether federal, state, or local—may not

3 harass, maliciously prosecute, or falsely imprison United States citizens.  A

4 person's freedom from abuse by government officials is a fundamental right

5 guaranteed by the United States Constitution as well as by multiple federal and

6 state statutes and the common law.

7      2.      Defendants have violated these fundamental laws on multiple

8 occasions and willfully caused harm to Plaintiffs.  Specifically, in their zeal to

9 convict a prominent Stanislaus County criminal defense attorney (Frank Carson) for

10 the murder of Korey Kauffman, members of Stanislaus County and Modesto law

11 enforcement concocted a far-fetched story whereby attorney Carson supposedly

12 engaged in a sweeping conspiracy with seven others—including police officers—to

13 murder Kauffman for allegedly stealing some antiques from his home.  The

14 Stanislaus District Attorneys' office and its investigators attempted to get

15 Plaintiffs—then California Highway Patrol ("CHP") officers—to (falsely) implicate

16 two of their friends/acquaintances in the purported murder-for-hire conspiracy—

17 Baljit Athwal and Daljit Atwal.  When Plaintiffs refused to do so, Defendants

18 subsequently engaged in a retaliatory pattern of harassment and abuse towards

19 Plaintiffs, which included unlawfully arresting them without probable cause, setting

20 former Officer Wells' bail at $10 million, and maliciously prosecuting them for

21 supposedly participating in attorney Carson's purported murder-for-hire plot.

22 Defendants also defamed Plaintiffs to their friends, family, and professional

23 colleagues, instigating a workplace investigation into Plaintiffs that resulted in their

24 termination, and prosecuted them for crimes they did not commit.

25      3.      To Plaintiffs' knowledge, this unlawful conduct was led by Kirk

26 Bunch, a criminal investigator with the Stanislaus County Office of the District

27 Attorney, and Jon Evers, a detective with the City of Modesto Police Department.

28

COMPLAINT                                    1
sf-4226436

4.      Defendants' willful and unlawful conduct has caused Plaintiffs to lose their careers in law enforcement that they cherished, suffer both economic harm, emotional distress, and irreparable damage to their reputation.

## JURISDICTION AND VENUE

5.      This civil rights action for declaratory and injunctive relief and compensatory and punitive damages is brought pursuant to, *inter alia*, the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, the California Tort Claims Act ("CTCA"), and law for relief from the commission of tortious acts.  This Court has jurisdiction over the federal claims pursuant to the constitutional provisions enumerated and 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), as the claims are brought to redress deprivations of rights, privileges, and immunities secured by the United States Constitution and by law. This Court has jurisdiction over the supplemental state claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in the Eastern District of California, under 28 U.S.C. § 1391(b), in that Defendants are located in this state and district, and a substantial part of the acts and/or omissions giving rise to Plaintiff's claims occurred in this district.

## PARTIES

I.      **PLAINTIFF**

7.      Plaintiff Walter W. Wells is a resident of Turlock, California.  He was employed as a California Highway Patrol officer for over seven years before he was falsely arrested on August 14, 2015, and maliciously prosecuted for murder and conspiracy to obstruct justice.

8.      Plaintiff Scott McFarlane is a resident of Turlock, California.  He was employed as a California Highway Patrol officer for over 11 years before he was falsely arrested on August 14, 2015, and maliciously prosecuted for acting as an accessory to murder.

## II.    DEFENDANTS

9.    Defendants Stanislaus County, City of Modesto, City of Ceres, and the Stanislaus County Office of the District Attorney are sued for the acts of their respective employees and agencies.

10.    Defendant Kirk Bunch is, and at all times mentioned herein was, a criminal investigator for the Stanislaus County Office of the District Attorney.  In that capacity, Bunch was responsible for the actions of the investigators and police officers who accompanied him during his investigations.  He is sued in his individual and official capacities.

11.    Defendant Bunch is a lead investigator on a task force composed of officers and investigators from the Modesto, Turlock, and Ceres police departments; the Stanislaus County Sheriff's Department; and the Stanislaus County Office of the District Attorney.

12.    Defendant Bunch, in his official capacity as a criminal investigator for the Stanislaus County Office of the District Attorney and lead investigator of the task force, is a municipal official whose acts constitute official policy for the County of Stanislaus.  Specifically, Defendant Bunch's orders had the effect of setting a particular course of action because other Defendants followed his orders, and Plaintiffs were harmed.

13.    Defendant Steve Jacobson is, and at all times mentioned herein was, an investigator for the Stanislaus County Office of the District Attorney.  In that capacity, Mr. Jacobson was responsible for the actions of the investigators and police officers who accompanied him during his investigations.  He is sued in his individual and official capacity.

14.    Defendant Jacobson, in his official capacity as a criminal investigator for the Stanislaus County Office of the District Attorney, is a municipal official whose acts constitute official policy for the County of Stanislaus.  Specifically,

1    Defendant Jacobson's orders had the effect of setting a particular course of action

2    since other Defendants followed his orders, and Plaintiffs were harmed.

3        15.    Defendant Dale Lingerfelt is, and at all times mentioned herein was, a

4    criminal investigator for the Stanislaus County Office of the District Attorney.  In

5    that capacity, Mr. Lingerfelt was responsible for the actions of the investigators and

6    police officers who accompanied him during his investigations.  He is sued in his

7    individual and official capacity.

8        16.    Defendant Jon C. Evers is, and at all times mentioned herein was, a

9    detective with the City of Modesto Police Department.  In that capacity, Detective

10    Evers was responsible for the actions of the police officers who accompanied him

11    during his investigations.  He is sued in his individual and official capacities.

12        17.    Defendant Cory Brown is, and at all times mentioned herein was, a

13    detective for the Stanislaus County Sheriff's Department.  In that capacity, Mr.

14    Brown was responsible for the actions of the investigators and police officers who

15    accompanied him during his investigations.  He is sued in his individual and official

16    capacity.

17        18.    Defendant Birgit Fladager is, and at all times mentioned herein was,

18    the Stanislaus County District Attorney.  In that capacity, Ms. Fladager was

19    responsible for the training, supervision, and/or discipline of criminal investigators

20    within her office, including Defendants Bunch, Jacobson, and Lingerfelt.  She is

21    sued in her individual and official capacity.

22        19.    Defendant Fladager had final policymaking authority from the County

23    of Stanislaus concerning the acts of Defendant Kirk Bunch and others.

24    Specifically, Defendant Fladager's orders had the effect of setting a particular

25    course of action since other Defendants followed her orders, and Plaintiffs were

26    harmed.

27        20.    Defendant Derek Perry is, or was at the time of the wrongdoing at

28    issue, a detective with the City of Ceres police department.

21.     Plaintiffs hereby refer to the above-named Defendants collectively as "Government Defendants."

22.     Government Defendants acted under the color of law, in bad faith, and contrary to clearly established law and principles of constitutional and statutory law.

23.     Plaintiffs are informed and believe and thereon allege that each of the Government Defendants caused, and is liable for the unconstitutional and unlawful conduct and resulting injuries, by, among other things, conspiring and personally participating in or assisting said conduct or acting jointly with others who did so; by authorizing, acquiescing, or setting in motion policies, plans, or actions that led to the unlawful conduct; by failing, or refusing with deliberate indifference, to maintain adequate supervision; and/or by ratifying the unlawful conduct taken by employees under their direction and control.

## FACTUAL ALLEGATIONS

## I.     BACKGROUND

24.     From an early age, Walter W. Wells ("Wells"), a long-time resident of Turlock, California, had an interest in serving the public through law enforcement. He dedicated his studies and career path in pursuit of this dream. From age 16 to 21, he volunteered with the Modesto CHP Explorer program, a community organization that trains young adults for a career in law enforcement.

25.     Wells pursued many avenues to reach his goal of becoming a law enforcement officer. His first job in law enforcement was at the Stanislaus County Probation Department as a juvenile hall group supervisor and correctional officer. He also worked at the Stanislaus County Sheriff's Department as a deputy sheriff custodial officer.

26.     In 2007, Wells was admitted to the CHP Academy. He graduated in April 2008 and promptly began serving his community as a CHP officer.

27.     Being a CHP officer was Wells' passion.  He received multiple MADD (Mothers Against Drunk Driving) Awards and "good deed" commendations from the CHP.

28.     Wells was a California Highway Patrol Officer for seven years before he lost his job and was falsely and maliciously arrested and maliciously prosecuted for participating in a murder in which he had no involvement whatsoever.

29.     Scott McFarlane ("McFarlane") is a lifetime resident of Turlock, California.  He was recruited to work for the CHP in 2002.  He graduated from the CHP Academy in November 2002 and promptly began service.

30.     After three years stationed in San Francisco and five years stationed in Modesto, McFarlane transferred to Merced where he had dreams to serve as a pilot in the CHP Air Operations.

31.     McFarlane was a California Highway Patrol Officer for 11 years before he lost his job and was falsely and maliciously arrested and maliciously prosecuted for participating in a murder cover-up in which he had no involvement whatsoever.

## II.     DEFENDANTS' MISCONDUCT TARGETING PLAINTIFFS

32.     Frank Carson was a prominent criminal defense attorney who actively worked to expose corruption within the ranks of Stanislaus County law enforcement.  Mr. Carson was a successful attorney and had several high-profile verdicts in his favor and against the Stanislaus County District Attorney's Office.  As a result of Carson's success, he was reviled by many in law enforcement and in the Stanislaus County District Attorney's office.

33.     Defendants' concocted theory to go after Carson was based on a murder for hire scheme in which brothers Baljit Atwal and Daljit Atwal, owners of a liquor store in Turlock, and their employee, Robert Woody, were supposedly solicited by Carson to murder thieves on his property in exchange for his representation of Woody in a minor criminal case.

34.   Not satisfied to simply take down Frank Carson, the Government Defendants falsely accused Wells and McFarlane of participating in the supposed conspiracy to murder Korey Kauffman and to cover up the crime, even though they had no knowledge of any such alleged plan.  The purpose was clear.  After Plaintiffs withstood pressure by the Government Defendants to falsely implicate two of their friends and acquaintances (Baljit Athwal and Daljit Atwal) [1] in Mr. Carson's supposed murder-for-hire plot, the Government Defendants retaliated against Plaintiffs by arresting and prosecuting them as accessories to Korey Kauffman's murder and alleged cover up even though there was no evidence to support such charges.  As further evidence of the Government Defendants' retaliatory and abusive actions, they set Wells' bail at $10 million, an amount they knew he could not pay on a CHP's officer's salary, which cause him to spend 16 months in jail.

A.   **Defendants' Concocted Conspiracy Is Based on a False Confession**

35.   Defendants' theory arose because Frank Carson and his wife, Georgia DeFilippo, have a hobby of collecting and selling antiques, including antique books and advertising signs.  They owned two properties in Turlock, California where they stored many of their antiques.  Christina DeFilippo was living in one of the properties in Turlock where antiques were stored.  In or about February 2011, Christina noticed that a lock on an outdoor container had been broken and the door was open. Christina notified her mother and stepfather of this.  Shortly thereafter, Carson and Georgia saw their belongings being sold by an antique dealer and learned they were being robbed.  Upon investigation of their property, they discovered a hole in the fence and a beaten path from the open container to an

---

[1] Baljit Athwal, his wife, Navneed Athwal, and Daljit Atwal maintain a related suit in the Eastern District of California. *See Baljit Athwal, Navneed Athwal, Daljit Atwal, and Karan Inc, d/b/a Pop-n-Cork v. County of Stanislaus et al*, Case No. 1:15-cv-00311-TLN-BAM.

adjacent home rented by Mike Cooley.  Mike Cooley is a career criminal, law enforcement informant, and a drug dealer.  The Carson family contacted law enforcement to report the thefts and the obvious evidence of the Cooley family's involvement, but they were told that nothing could be done unless Cooley was seen with their property.

36.     Korey Kauffman was an associate of the Cooley family and made his living by stealing things and recycling them for money.  He was, on information and belief, a known thief and drug addict and had many enemies, including drug dealers from whom he had stolen.  Mr. Kauffman went missing on March 29, 2012.  The last person to see Kauffman alive was Michael Cooley.

37.     On April 4, 2012, two days after Korey Kauffman was reported missing, Defendant Kirk Bunch filed a report that he claimed was based on information from a Turlock Police Department officer with whom Defendant Bunch had worked in the past.  The conversation purportedly concerned statements from Cooley, a known criminal and drug user, who was the last person to see Kauffman alive.  Cooley apparently sought to implicate Carson (and by extension, Baljit and Daljit) in Kauffman's murder.  Defendant Bunch did not record the conversation and claimed to have destroyed any notes from the conversation.  Defendant Bunch and others omitted from warrant applications this information about lacking or destroying records of the purported conversation.

38.     Thereafter, the District Attorney Defendant Birgit Fladager convened a task force for the purpose of targeting Frank Carson.  Defendant Fladager was motivated to wrongfully investigate and prosecute Carson because she had lost several major trials against him prior to becoming DA.  When Defendant Fladager ran for District Attorney, Frank Carson was one of the largest contributors to her opponent, and after her election, he worked to have her recalled.  It is highly unusual for the District Attorney's office to lead an investigation into a missing

person, yet at the mere mention of Frank Carson's name the District Attorney's office became the lead investigating agency on this case.

39.    On February 14, 2013, Defendant Bunch filed a report documenting an interview with Charlie Odell, an inmate who claimed that Michael Cooley had confessed to killing Kauffman.  Odell reported that he encountered Cooley after Cooley had disposed of Kauffman's body.  Odell submitted to a computer voice stress analyzer that indicated he was being truthful.  It was known at this time that Cooley was selling drugs out of his residence, in particular crystal methamphetamine, and that Kauffman was a crystal methamphetamine addict.

40.    Despite the fact that several people unrelated to Frank Carson had made threats against Kauffman, Defendants ignored that evidence and instead conspired to frame Frank Carson for the murder.  Defendants also ignored the fact that Kauffman had also stolen marijuana from a known drug dealer and that his body was found near a marijuana farm associated with that drug dealer.  The Defendants further ignored that Michael Cooley himself should have been a prime suspect in the case since he was the last person to see Kauffman alive, and Cooley buried Kauffman's bicycle in his backyard after Kauffman's disappearance.  In addition to pointing the finger at Frank Carson, Cooley also accused several other people of murdering Kauffman and confessed to witnesses that he himself was involved in the murder. **None of this exculpatory evidence was disclosed to the judge in the arrest warrant for Plaintiffs.**

41.    Also as part of the conspiracy, upon information and belief, defendant Derek Perry ("Perry"), City of Ceres Police Department Detective, destroyed evidence from game cameras in the area where Kaufmann's body was found. Before the location where the body was found was made public, Defendants Bunch and Perry set up game cameras to watch the area.  Upon information and belief, the cameras revealed that two marijuana growers and dealers, David McMillan and Jason Armstrong, were in the area where the body was found, before the public

1   knew where the body was found.  These two persons are believed to have made

2   threats against Kauffman prior to his disappearance.  The Defendants interviewed

3   McMillan and Armstrong, and McMillan asked the Defendants why they were even

4   investigating this case and said that Kauffman was a "piece of shit thief."  Upon

5   information and belief, Defendants knew that Armstrong and McMillan were heard

6   talking about where Korey Kaufman was buried before that information was public.

7   None of this was included in the arrest warrant for Plaintiffs.  Upon information

8   and belief, Defendant Perry and Defendant Bunch destroyed the evidence on the

9   game cameras showing McMillan was in the area where the body was found

10   because it was inconsistent with, and did not support Defendants' theory that Frank

11   Carson had masterminded the alleged disappearance of Mr. Kauffman.  Defendants

12   ignored McMillan and Armstrong as suspects and continued to go after Frank

13   Carson and people they believed were associated with him, including Plaintiffs

14   because it was inconsistent with, and did not support Defendants' theory that Frank

15        42.    On February 18, 2014, Robert Woody was wire recorded by his

16   girlfriend while under the influence.  Woody purportedly mentioned Kauffman, the

17   investigation, and referenced methods of disposing bodies.  Although unclear to

18   what he was referring, Woody claimed to have acted alone.

19        43.    On March 1, 2014, Defendants Bunch, Evers, Jacobson, Lingerfelt,

20   and others interviewed Robert Woody following his arrest for the murder of Korey

21   Kauffman.  Woody initially denied involvement and could not identify Kauffman

22   from a photograph.  Implying that Woody's recorded conversations with his

23   girlfriend amounted to a "confession," Defendants Bunch and Evers coerced and

24   led Woody into giving false testimony about Athwal and Atwal.  Through their

25   questions, they recited Government Defendants' theory implicating Carson,

26   Athwal, and Atwal in Kauffman's murder.  In this coercive environment—with

27   express and implied promises of leniency for his cooperation—Woody eventually

28   acquiesced and repeated aspects of the theory that Defendants Bunch and Evers had

recited to him.  This false "confession" became one of central piece of evidence in the Government Defendants' criminal case against Athwal and Atwal.

44.     The following quoted words are actual statements made by the Government Defendants during their lengthy interrogation of Woody on March 1, 2014.

a) "They're all going to be pointing their fingers at you" (3/1, 27424).

b) "This is the golden opportunity" to implicate others (3/1, 429).

c) Told Woody he is facing "life in prison" (3/1, 27465).

d) Told Woody that the crime involved "lying in wait with special circumstances" (3/1, 27423).

e) "We can go for the death penalty" (3/1, 424).

f) People in Woody's situation "spend the rest of their life in prison" (3/1, 465).

Any reasonable police investigator would know that such statements would be very threatening to any rational person and could (and in this case, did) lead to false assertions by Woody in order to avoid harsh penalties, including the death penalty.

45.     In addition to purposely intimidating Woody, and leading him to believe that unless he "cooperated" he would face the death penalty, investigators scripted what they wanted him to say.  Instead of allowing the alleged wrongdoer to tell them what happened, they fed him the information that they needed to go after Carson, Atwal, and Athwal.  The following quoted words are actual statements made by the Government Defendants to Woody during his interrogations:

a) "Prior to the murder . . . you guys were talking in front of him, okay, about Frank's property and how you were instructed to go find Korey Kauffman, okay, to make an example out of him" (3/1/14, 27418).

b) "You're gonna be the one who's gonna be doing the right thing and who had probably the least involvement in saying that you were there, okay, and there were some hits that were thrown, not necessarily were gonna kill him but it just happened, okay" (3/1/14, 27423).

1        c) "I don't believe that you meant – that you knew he was gonna be

2   murdered" (3/1/14, 27439).

3        d) "Everybody had their involvement.  Everybody played a role, okay, and

4   that's what needs to be told" (3/1/14, 27439).

5        e) "You were involved or at least witnessed the murder" (3/1/14, 27458).

6        f) "You perhaps witnessed this but that you didn't actually hurt this guy, you

7   were actually like what your mom said, the guy who went to help Korey and you

8   tried to pull this Bobby guy off" (3/1/14, 27476).

9        g) "Well me being a smart guy and operating off of common sense, okay,

10  making reference to the murder that happened two months prior.  Okay? 'Stay off

11  the property.  What happens to Frank, happens to me.'  Those are the key points

12  that were said afterwards, but we're interested in your confession, okay, about your

13  involvement with the murder.  Okay?  That's what we're interested in.  Okay . . .

14  I'm trying to show you the light.  This is your golden opportunity" (3/1/14, 27505).

15       h) "Baljit and Daljit were supposed to make an example for her, uh, Frank.

16  Frank wanted – I mean pretty much was going on is they weren't gonna call law

17  enforcement.  Okay?  They're – they were supposed to make an example.  Because

18  if they made an example of somebody the thefts would stop" (3/1/14, 27652).

19       i) "So you know as truth Baljit – Bobby – and Dee are responsible for the

20  death of Korey Kauffman, right?" (3/1/14, 27656).

21       j) "We'll make it better.  Hey, all you're going to see is we're rolling the ball

22  for you. . . .  We need more stuff that can help us help you.  All right?" (3/3/14, 27).

23       k) "Now I just want to tell you the DA is on board, okay, working with you.

24  All right?  Because there's other people involved in this whole thing.  And so we're

25  trying to get – all squeeze out all the information.  Because there's other people

26  involved in this whole thing.  And so we're trying to get – all squeeze out all the

27  information.  Because if you squeeze out all information, this is going to be better

28  for you.  Okay?  Because the DA wants to use you pretty much as like a kind of a

1  witness . . . The DA is, I'm telling you, wants to work with you . . .  And then what

2  happens is the court – when the court comes up, the DA will talk to the court, your

3  attorney, and work out a formal deal with you" (3/3/14, 2-3).

4      l) "I'll be honest with you even if you did thumped on him doesn't mean that

5  you killed him" (3/14/14, P. 15).

6      m) "And when you do tell the truth it can help you, and it can take you out of

7  this situation that you're in and put you in a situation that is a lot more favorable for

8  Robert Woody, and not go down for other people's misdeeds and not to be alone

9  and be prosecutor by yourself at the table.  Do you understand that?" (30415,

10  3/14/14, 11-12).

11      n) "And so now these guys have basically done vigilante justice to kill

12  somebody who stole from them and it would be like people at Walmart grabbing

13  you mom and saying, 'you know what? You know deserve to die instead of your

14  one year in the county jail for stealing video's now it's the death penalty'" (3/14/14,

15  19).

16      o) "The whole truth you're gonna go away for just (unintelligible) . . . You're

17  never going to get to see your kids again except in visits when they come visit you

18  in prison . . . You'll – you'll never – you'll never see your or you'll never be able to

19  spend time with your mom and your dad.  With your mom's health conditions, you

20  may not even – you may not even be able to be around her to comfort her when she

21  needs you the most . . . And that's – and that's where we're coming from Robert"

22  (3/14/14, 2, 30406).

23      p) "Because there's four people that are prime suspects in this case.  You,

24  Bobby, Dee, and Frank. . . . And you're the on – you're the only one that's in

25  custody right now because of how the evidence is being played out . . . I guarantee

26  that it took more than one person to do this.  I guarantee that" (3/14/14, 8).

27

28

q) "They'll teach you a lesson and it's a lesson that they teach other people by how they treat you as well.  They'll take you out.  That's why you're where you're at" (3/14/14, 30425).

r) "You couldn't have stopped it.  You didn't want him dead" (8/14/15, 28676)

s) "There's nothing you could've done to stop it" (8/14/15, 28715)

t) "You're not the monster but you know who the monster is" (3/14/14, 30419)

u) After telling Woody that he has a chance to talk to the deputy District Attorney: "And I hope that you believe that you're in a position that you can help us as well as help yourself" (8/14/15, 28516).

v) "We're both here to help you" (8/14/15, 28604).

w) "You're the one that had the Chief Deputy DA – had Marlisa talking to you saying, 'I've been trying to help here with you being able to tell what happened'" (8/14/15, 28698).

x) "We all know that you were manipulated, you were exploited.  And to come clean on that now is not just going to get the respect of these guys.  Your family wants you home.  They're not going to hold that against you, they love you too much" (8/14/15, 28729).

y) "It was daylight, in the BMW, right in front of Korey's house.  The neighbor was across the street and outside and heard this.  Identified the black BMW.  Identified you and identified an Indian male in the vehicle as well.  And we all know it was Daljit's BMW" (8/14/15, 28561).

z) "But the neighbor says she heard a male from the vehicle say, 'Your ass is grass,' and the vehicle drives away.  And then the neighbor describes this black BMW with an Indian male driver and a white guy.  And another person says, 'Yeah, that was Robert Woody.'  And the Indian male they're kind of unknown as to which one it was, whether it was Baljit or Daljit" (8/14/15, 28562).

1    aa) "Okay.  All Right.  So, we're saying that this is the last week of March

2    and that the neighbor, uh, hears you guys come by and make that statement outside.

3    All right.  The 28th or the 29th.  That – Scott comes in asking about Korey is of

4    course after this date cause Korey's missing after this date" (8/14/15, 28576).

5    ab) "They looked at you as somebody they could use for whatever they

6    needed to do, whether it was to drive by, um, Korey's house and yell out the

7    window.  'Woody, will go.  Get in the car.  Let's go.  Let's go do this.'  Right?"

8    (8/14/15, 28634).

9    ac) "Those details are important because details let us know that you're

10   telling the truth.  When they match up with the details we have, right?  That's what

11   I told you about the cellphones. . . . There are some details that I'm absolutely right

12   about.  That's why I shared with you the stuff about the CHP sergeants" (8/14/15,

13   28650-51).

14   ad) "We're talking about Bobby hitting Korey in the back of the head, in the

15   ribs. . . . Okay, with his fists, right?  Not with another weapon" (8/14/15, 28657).

16   ae) "Korey couldn't get away from it. . . . You two guys and they're big guys

17   and they're not afraid to hit somebody" (8/14/15, 28658).

18   af) "And where is Korey when all this is going on?  It's hard for me to

19   imagine that Korey's still upright with these two guys that look like WWF guys

20   hitting him in the head.  I don't think somebody stays up very long when that

21   happens" (8/14/15, 28658).

22   ag) Sergeant Domby says, "Slapping and punching with closed fists both?"

23   ah) Sergeant Domby says, "Slapping the head and punching the head."

24   ai) Sergeant Domby says, "Uh, and you're not going to slap him in the ribs.

25   You're going to deliver a rib shot with your fist.  Right?" (8/14/15, 28659).

26   aj) Jacobson: "Did they – because when they were doing the slapping motion

27   and they weren't using their knees because they didn't want to involve their back

28   and their legs."

ak) "Although there may be some doubt as to what you actually did at Frank's property, it seems pretty clear that the common denominator between everybody and even it coming out of your own mouth with Sunny is that you cleaned up.  You know you – you helped them in some manner or some shape – some form or – of another to – to help clean up this situation" (8/14/15, 28713).

al) "I mean, this was – Baljit and Daljit were saying this was going to make uncle Frank proud and – and it was going to, you know, this was what they wanted to do for him?" (8/14/15, 28776).

am) "It certainly you got a sense that they felt the beating that they were delivering to Korey was going to make Frank happy?" (8/14/15, 28777).

an) "He wants somebody to do something law enforcement can't." (8/14/15, 28778).

ao) Sergeant Domby and Investigator Jacobson suggest that Daljit fired with a small caliber handgun, like a .22 (8/14/15, 28686-28687)

ap) Robert Woody said that he didn't see any weapons, after which the following exchange occurs:

Sergeant Domby: "You didn't see a weapon but that doesn't mean there wasn't one.  Uh, and then as they walk away or as you walk away you hear the sound."

Woody: "Yes."

Domby: "That could've been a gunshot" (8/14/15, 28691).

aq) "It just is not making sense.  Bobby had already been on the property. Bobby had been in the backyard.  Bobby had been through the pedestrian gate.  He knew what the property looked like.  Bobby had pulled guard duty on the property, obviously . . . catching Korey" (10/6/15, 27934).

ar) "So, she said that she's walking down the road.  And she sees you as a passenger in the car.  She sees an Indian male driving.  It's Dee's BMW.  And she

sees you guys driving by.  And Korey – Korey walks up to hear at – at that period of time right after this threat is made" (10/6/15, 27942).

as) "The car doesn't make an abrupt stop?  It doesn't injure your neck?  You're not rubbernecked.  You're not like, 'What the hell is going on?  Why did we just stop in the middle of the road?'  Okay, it's almost like it's preplanned" (10/6/15, 27943).

Any reasonable police investigator would know that such leading and suggestive statements are contrary to reasonable police practices and would (and in this case, did) lead to false assertions by Woody in order to appease the investigators and avoid harsh penalties, including the death penalty.

**B.** **Defendants' Commence Retaliatory Campaign Against Plaintiffs**

46.	On March 7, 2014, Detectives Evers and Bunch interviewed Wells. He informed the detectives that he was friends with Athwal and Atwal and that they had nothing to do with Kauffman's murder.  Wells also told the detectives he believed Athwal and Atwal were being mistreated and improperly harassed by law enforcement during the investigation.

47.	Detectives Bunch and Evers, angered by Wells' refusal to falsely incriminate his friends, started a retaliatory campaign against Wells that included harassing Wells' girlfriend at the time and defaming him to his family, friends, and colleagues.

48.	On information and belief, Detective Bunch instigated an internal investigation at the CHP against Wells that resulted in him losing his job.  This tip off was maliciously motivated by Detective Bunch's desire to deter Wells' continued friendship and support of Athwal and Atwal and/or to create leverage against Wells so that he would (falsely) implicate Athwal and Atwal in Defendants' supposed murder-for-hire conspiracy theory.

49.	On March 7, 2014, Detectives Bunch and Evers interviewed McFarlane, who was Kauffman's next-door neighbor.  McFarlane told Bunch and

1 Evers that he believed he saw Kauffman riding his bike on the Sunday morning

2 after he went missing, thus undermining their theory of when Kauffman was

3 murdered.

4      50.    In a pattern of retaliation similar to their treatment of Wells, Detectives

5 Evers and Bunch targeted McFarlane because his friendship with Atwal and

6 Athwal, and his observation of Kauffman on the Sunday morning after he went

7 missing, compromised the murder-for-hire conspiracy theory Defendants had

8 concoted.

9      51.    Defendant Kirk Bunch submitted affidavits to the criminal court and

10 directed the malicious investigation and arrest of Plaintiffs.  Defendant Bunch's

11 questionable practices had previously been exposed by Frank Carson when Bunch

12 was involved in another political vendetta against the former mayor of Modesto.

13 Carson represented the former mayor and wrote declarations in state and federal

14 court exposing Investigator Bunch for dishonesty and accusing him of intimidating

15 witnesses.

16 **III.**  **DEFENDANTS' MISCONDUCT IN ARRESTING PLAINTIFFS**
**WITHOUT PROBABLE CAUSE AND MALICIOUSLY**
17 **PROSECUTING THEM**

18      52.    On August 14, 2015, along with seven others[2], Plaintiffs were arrested

19 without probable cause.  In addition to lies and misrepresentations in search

20 warrants, there were several significant fabrications and omissions in the warrant to

21 secure Plaintiffs' arrest as follows:

22      •   The arrest warrant indicates that Kauffman disappeared on March 30,

23          2012.  Defendants knew this was not true but asserted this date

24          because their cell phone "expert" claimed that Carson, Wells, and the

25

26     [2] The following individuals were also arrested: Frank Carson, Georgia DeFilippo, Carson's wife,
Christina DeFilippo, Carson's stepdaughter, Baljit Athwal, Daljit Atal, and CHP Officers Eduardo
27 Quintanar, Jr.

28

Athwals were in the vicinity of Carson's Turlock property on the night of March 30, 2012.  This "expert" testimony was later excluded from the criminal trial after he admitted under oath that the cell towers showed that the Athwals were never on the Carson property the night of March 30, 2012.

- The warrant alleges that Kauffman was going over the fence to steal metal pipes, but law enforcement knew full well there were never any pipes on Carson's property.

- Defendants made several false and misleading representations in the warrant to place Frank Carson and the DeFilippos in a negative light, including omitting an "LOL" from a text message that clearly indicated they were joking, misrepresenting Carson's interactions as an officer of the court, including saying that Carson lied in a 911 call he made when Defendants trespassed at his law office and would not leave.

- The arrest warrant says Carson visited Ron Cooper in jail to solicit his "muscle" to help him with thefts on his property.  It is easily verifiable that Carson had never visited Cooper in jail, yet Defendants omitted this fact from the arrest warrant.

- Defendants procured a cell phone "expert" to place the Atwals on Carson's property the night of the murder, and this was used in the arrest warrant to secure Carson's arrest.

- The arrest warrant did not contain any information about the lack of credibility of the witnesses, including multiple contradictory statements by witnesses, especially Robert Woody's several different statements where he denied involvement altogether or said the Atwals hired a Mexican prison buddy to kill Kauffman (even though neither Atwal had ever been to prison).  It further failed to inform the judge of

grants of immunity or plea deals given to witnesses and the extreme coercion employed to fabricate witness statements.

- The fact that Cooley also accused other people of being involved in the murder of Kauffman was never disclosed in the arrest warrant.

- Defendants' bias against Carson, including Carson's civil lawsuit against Jacobson for assault, a jury tampering hearing against Jacobson and Harris, and the accusations that Carson had made against Bunch, were never disclosed in any warrants.

53.     For the first time in Stanislaus County history, the entire arrest warrant, including the personal identifying information and social security numbers of the accused, was posted online.

54.     Defendant Brown was the affiant of the Ramey warrant to arrest Walter Wells and Scott McFarlane, but Plaintiffs are informed and believe and thereon allege that Kirk Bunch was instrumental in the contents of the arrest warrant.  As set forth above, the warrant for Plaintiffs' arrest includes several falsehoods, fabrications, misrepresentations, and omissions.  No reasonable officer would have believed that the arrest warrant established probable cause for the arrest of Wells and McFarlane.

55.     Wells spent 16 months in the Stanislaus County Jail with bail set at $10 million, an amount the city and county knew he could not pay.  Wells was not released until December 13, 2016, when the judge reduced his bail to $50,000.

56.     A preliminary hearing began on October 13, 2015, and continued for 18 months, one of the longest in California history.  During the preliminary hearing, Defendant Jacobson procured

57.     At the preliminary hearing, the Government Defendants elicited false testimony from Robert Woody and others based on the theory that Defendants Bunch and Evers had first suggested to Woody on March 1, 2014.  The

Government Defendants knew, or should have known, that Woody's testimony was false and withheld exculpatory information that undermined the testimony.

58.     At some time, law enforcement gave Woody a polygraph test and he was asked whether he had anything to do with murder.  He said no, and he passed the test.

59.     Also during the preliminary hearing, Defendant Jacobson procured further false testimony from Robert Woody because there was no evidence that Frank Carson and CHP Officer Walter Wells were on Carson's property that night of the alleged murder.  Woody had repeatedly told investigators that Carson had never asked them to hurt anyone stealing from his property. Defendant Jacobson had Robert Woody's mother, Beverly Woody, hold up a note to Robert Woody during a jail visit telling him they needed more implicating Carson and Wells. Following this, Woody changed his story (yet again) and said Carson and Wells were on the property the night Kauffman was murdered. Woody recanted this statement several days later.

60.     The Government Defendants also relied on their cell phone expert, Jim Cook, who was not qualified and was later forced to admit that his interpretations of cell phone records were not reliable and, in certain instances, were demonstrably incorrect.  The Government Defendants failed to timely turn over exculpatory evidence, including emails, that undermined their expert's opinions on the cell phone records.

61.     Defendant Evers also participated in fabrication of evidence by Scott Rollins by hiding evidence that this witness saw Cooley and Cooley's girlfriend's son, Keith Hobbs, beating up Korey Kauffman and instead creating false evidence that the Atwals had a motive to murder Kauffman.

62.     There was never any evidence that a murder had occurred on Frank Carson's Turlock property.  All of the testimony was from the career criminals and could easily have been proven false by even a cursory investigation of physical

evidence.  There was no blood, hair, clothing fibers, fingerprints, saliva, sweat, or any such thing found on Mr. Carson's property where the Defendants claimed the murder occurred.  There was allegedly a gunshot that no one heard in a neighborhood full of people.  There was no blood, hair, clothing fibers, fingerprints, saliva, sweat, or any such thing found at the Pop N Cork liquor store where the body was allegedly taken and buried for months until it was supposedly dug up by the Atwals and taken to the mountains.  This burial allegedly occurred in a crowded neighborhood with no witnesses and where numerous law enforcement frequented, yet no one so much as smelled a decomposing body that was allegedly a mere 14 inches underground near the backroom where law enforcement regularly gathered to drink after their shifts.

63.    Also as part of the conspiracy, Derek Perry, City of Ceres Police Department Detective, destroyed evidence from game cameras in the area where Korey Kaufmann's body was found.  There was exculpatory evidence on those cameras showing that someone else was likely responsible for Korey Kaufmann's death.

64.    At the end of the 18-month preliminary hearing, the judge dismissed the murder charge against Wells finding there was no evidence to support it.

65.    The judge, however, upheld the charges of conspiracy to obstruct justice and acting as an accessory to Kauffman's murder based on the Government's misleading and unreliable cell phone expert testimony and despite acknowledging that the Government had changed its timeline during the preliminary hearing.

66.    As a result of the Government Defendants' use of false and misleading evidence and their failure to timely turn over exculpatory evidence and other systematic and procedural failures, Wells spent 16 months in prison and was held to await trial without probable cause.

67.     On June 28, 2019, after a 14-month criminal trial, the jury found Carson, Athwal, and Atwal not guilty on all charges of first- and second-degree murder and conspiracy to obstruct justice.

68.     Despite the acquittal of the primary suspects, the District Attorney persisted in its retaliatory and abusive conduct towards Plaintiffs by continuing to pursue the baseless charges against them.  The District Attorney also moved to postpone the trial to explore further evidence and filed oppositions to two motions to dismiss the case.

69.     On October 21, 2019, District Attorney Birgit Fladager filed a motion to dismiss all charges against McFarlane.  Then on December 26, 2019, District Attorney Birgit Fladager filed a motion to dismiss all charges against Wells in "the interest of justice."  The judge entered the dismissals on January 2, 2020.  These dismissals, however, were too late to remedy the devastating harm Plaintiffs had already endured for four years.  McFarlane lost his job as a California Highway Patrol officer, lost his retirement benefits, experienced irreparable damage to his reputation, and lost money he had to spend on legal expenses.  Wells lost his job as a California Highway Patrol officer, lost his house, lost his retirement benefits, experienced irreparable damage to his reputation, spent 16 months in jail, and lost money he had to spend on legal expenses and to bail himself out of jail.

70.     All of the Defendants were involved in a conspiracy to violate Plaintiffs' constitutional rights, as well as a conspiracy to defame, falsely arrest, and maliciously prosecute them.  Each of the defendants were involved in the malicious, retaliatory investigation and prosecution and/or in furthering the goals of the conspiracy, which was to destroy the life and career of Frank Carson, his family, and those unwilling to cooperate in the investigation, like Plaintiffs.

71.     Defendant Birgit Fladager acted outside her role as a prosecutor and acted as a supervisor, investigator, and administrator.  Defendant Fladager gave legal advice to investigators and police officers including advice that they had

probable cause to search and arrest Plaintiffs, engaged in the planning, drafting, and execution of search and arrest warrants based on evidence they knew was false, coerced and fabricated in order to search and to arrest Plaintiffs; and otherwise, fully participated in and advised the officers and investigators throughout the investigation in which probable cause never existed to arrest Plaintiffs.  Defendants knew there was not probable cause to suspect Plaintiffs of any crime, yet they falsely and maliciously arrested and prosecuted them in order to fulfill a retaliatory scheme to destroy Frank Carson and/or to punish Plaintiffs for their refusal to proffer (false) testimony that would support Defendants' murder-for-hire conspiracy theory.

## IV.   RESPONSIBILITY OF DEFENDANT FLADAGER

72.   The Government Defendants' conduct described above resulted from a failure of training, supervision, and/or discipline of the individuals involved, as well as their policies.

73.   Defendant Birgit Fladager, and/or her designee, was responsible for the training/supervision/discipline and actions of the investigators, including Defendants Bunch, Jacobson, and Lingerfelt.

74.   On information and belief, there has been a pattern of constitutional violations by the Government Defendants against Plaintiffs and other similarly situated residents of Stanislaus County, including the seven other individuals arrested in August 2015.  Defendant Fladager, and/or her designee, knew of this pattern of violations of constitutional rights but did not respond with appropriate trainings, supervision, and/or discipline to avoid such violations in the future.

75.   On information and belief, Defendant Fladager, and/or her designee's failure to properly train, supervise, and/or discipline the investigators was a direct and proximate cause of the unlawful acts against Plaintiffs.

1    76.    On information and belief, Defendant Fladager's policies, practices,

2    and/or customs enabled and emboldened the investigators to violate Plaintiffs'

3    constitutional rights.

4    77.    Defendant Fladager, and/or her designee, either knew or should have

5    known of the unlawful actions committed by the investigators described herein,

6    including the egregious acts of Defendant Bunch.  On information and belief,

7    Defendant Fladager, and/or or her designee, knew and approved and/or ratified the

8    unlawful conduct of the investigators.

9    **V.    ADMINISTRATIVE PROCEEDINGS**

10    78.    Pursuant to California Government Code §§ 910 *et seq.*, Wells timely

11    filed a claim with the County of Stanislaus and City of Modesto on April 9, 2020.

12    The County of Stanislaus and City of Modesto notified Wells' counsel on April 27,

13    2020 and May 22, 2020, that his claims have been rejected.

14    79.    On April 20, 2020, McFarlane timely filed claims with the County of

15    Stanislaus, City of Modesto, City of Turlock, and City of Ceres.  The City of

16    Turlock notified McFarlane on May 14, 2020 that his claims have been rejected.

17    He has not received a response from the County of Stanislaus, the City of Modesto,

18    or the City of Ceres.

19    **CLAIMS FOR RELIEF**

20    **<u>FIRST CLAIM FOR RELIEF</u>**

21    **(Malicious Prosecution, 42 U.S.C. § 1983 – Against All Defendants)**

22    80.    Plaintiffs reallege and incorporate herein by reference each and every

23    allegation contained in paragraphs 1 through 79 of this Complaint.

24    81.    Government Defendants wrongfully caused charges to be filed against

25    Walter W. Wells and Scott McFarlane.

26    82.    Government Defendants prosecuted Plaintiffs with malice.

27    83.    Government Defendants prosecuted Plaintiffs without probable cause.

28

84.     No reasonable person in Government Defendants' circumstances would have believed there were grounds for causing Plaintiffs to be arrested or prosecuted.  On information and belief, Plaintiffs were arrested and charged, and bail was set at $10 million for Wells because of their association with Athwal and Athwal and for the purpose of pressuring Wells and McFarlane to testify against others accused of the Kaufman murder.

85.     Government Defendants knew or should have known that arresting Plaintiffs under these circumstances would deprive them of their rights under the First and Fourteenth Amendments.

86.     The failure of Government Defendants to provide adequate training and/or supervision caused the unlawful acts complained of herein.

87.     These violations are compensable pursuant to 42 U.S.C. § 1983.  As a direct and proximate result of these Government Defendants' conduct, Plaintiffs have suffered economic damage and significant physical and emotional harm.

## SECOND CLAIM FOR RELIEF

**(Violations of Fourth and Fourteenth Amendments, 42 U.S.C. § 1983 – Against All Defendants)**

88.     Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 79 of this Complaint.

89.     Government Defendants wrongfully caused charges to be filed against Walter W. Wells and Scott McFarlane.  They were arrested and charged without probable cause based on inaccurate and misleading information that was provided to the state judges in arrest and search warrant affidavits and at the preliminary hearing.  Plaintiffs' arrests were based on a plan to pressure them into testifying against others, namely Carson, Atwal, and Athwal.  When Plaintiffs refused to go along with Defendants' conspiracy, Defendants retaliated against them by bringing false charges.

90.     These violations are compensable pursuant to 42 U.S.C. § 1983.  As a direct and proximate result of these Government Defendants' conduct, Plaintiffs have suffered economic damage and significant physical and emotional harm.

## THIRD CLAIM FOR RELIEF

**(Violation of Fourteenth Amendment Right to Due Process, Deliberate Fabrication, 42 U.S.C. § 1983 – Against County of Stanislaus, Stanislaus County Office of the District Attorney, City of Modesto, Kirk Bunch, Jon Evers, Dale Lingerfelt, Steve Jacobson, Birgit Fladagar)**

91.     Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 79 of this Complaint.

92.     Government Defendants presented the false and misleading testimony of Robert Woody, both at Plaintiffs' preliminary hearing and at trial.

93.     Government Defendants presented the false and misleading testimony of their cell phone expert, both at Plaintiffs' preliminary hearing and at trial.

94.     Government Defendants presented false and misleading evidence concerning the number of times Korey Kauffman was shot.

95.     Government Defendants continued their investigation and prosecution of Plaintiffs even though they knew, or should have known, Plaintiffs were innocent.

96.     Government Defendants used investigative techniques so coercive and abusive they knew, or should have known, that those techniques would yield false information.

97.     Government Defendants deliberately mischaracterized statements in their investigative reports.

98.     The failure of Government Defendants to provide adequate training caused the unlawful acts complained of herein.

99.     These violations are compensable pursuant to 42 U.S.C. § 1983.  As a direct and proximate result of these Government Defendants' conduct, Plaintiffs have suffered economic damage and significant physical and emotional harm.

## FOURTH CLAIM FOR RELIEF

**(Violations of Eighth Amendment Rights, Excessive Bail, 42 U.S.C. § 1983 – By Wells Against County of Stanislaus, Stanislaus County Office of the District Attorney, Kirk Bunch, Jon Evers, Dale Lingerfelt, Steve Jacobson, Birgit Fladagar)**

100.   Plaintiff Walter W. Wells realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 79 of this Complaint.

101.   Government Defendants unlawfully set Wells' bail at $10 million, an amount that was excessive in light of the purposes for which it was set and especially given Defendants' lack of probable cause to arrest Wells.  On information and belief, bail was set in that excessive amount for the purpose of pressuring Wells to testify against others accused of the Kaufman murder.

102.   As a direct and proximate result of the actions of Government Defendants, Plaintiff Wells suffered economic damage.

## FIFTH CLAIM FOR RELIEF

**(False Arrest and Imprisonment, California Tort Claims Act, Against All Defendants)**

103.   Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 79 of this Complaint.

104.   Government Defendants unlawfully deprived Plaintiffs of their liberty by arresting and detaining them without a legal basis to do so.  Government Defendants arrested Plaintiffs without any probable cause.  On information and belief, Plaintiffs were arrested and charged for the purpose of pressuring Wells and McFarlane to testify against others accused of the Kaufman murder.  They were arrested and charged without probable cause based on inaccurate and misleading information that was provided to the state judges in arrest and search warrant affidavits and at the preliminary hearing.

105.   Government Defendants were acting within the scope of their employment when they committed these acts.

106.   As a direct and proximate result of Government Defendants' conduct, Plaintiffs have suffered and continue to suffer damage in an amount to be proved at trial.

## SIXTH CLAIM FOR RELIEF

**(Negligent Infliction of Emotional Distress, California Tort Claims Act, Against All Defendants)**

107.   Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 79 of this Complaint.

108.   Government Defendants' negligent acts regarding the harassment and subsequent arrest of Plaintiffs, without basis under the law, caused Plaintiffs serious emotional distress.  On information and belief, Plaintiffs were arrested and charged, and bail was set at $10 million for Wells, for the purpose of pressuring Wells and McFarlane to testify against others accused of the Kaufman murder.

109.   As a direct and proximate result of the actions of Government Defendants, Plaintiffs suffered and continued to suffer economic damage, severe mental anguish, and emotional and physical distress.

## SEVENTH CLAIM FOR RELIEF

**(Intentional Infliction of Emotional Distress, California Tort Claims Act, Against All Defendants)**

110.   Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 79 of this Complaint.

111.   Government Defendants' willful acts constitute outrageous conduct insofar as they were intended to cause Plaintiffs to be harassed and arrested without basis under the law.  On information and belief, Plaintiffs were arrested and charged, and bail was set at $10 million for Wells, for the purpose of pressuring Wells and McFarlane to testify against others accused of the Kaufman murder.

112.   Government Defendants intended to cause Plaintiffs emotional distress and/or acted in reckless disregard of the probability of causing emotional distress in committing these acts.

113.   As a direct and proximate result of the actions of Government Defendants, Plaintiffs suffered and continued to suffer economic damage, severe mental anguish, and emotional and physical distress.

## EIGHTH CLAIM FOR RELIEF

### (Malicious Prosecution, California Law, Against All Defendants)

114.   Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 79 of this Complaint.

115.   Government Defendants caused Plaintiffs to be prosecuted.

116.   No reasonable person in Government Defendants' circumstances would have believed there were grounds for causing Plaintiffs to be arrested or prosecuted.  On information and belief, Plaintiffs were arrested and charged, and bail was set at $10 million for Wells, because of their association with Atwal and Athwal and for the purpose of pressuring Wells and McFarlane to testify against others accused of the Kaufman murder.

117.   Government Defendants acted primarily for a purpose other than to bring Plaintiffs to justice.

118.   Government Defendants' conduct was a substantial factor in Plaintiffs suffering economic and noneconomic damage in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants, and each of them, as follows:

1.     For general damages against Defendants, jointly and severally, in an amount to be proved at trial;

2.     For special damages against Defendants, jointly and severally, in an amount to be proved at trial;

3.     For punitive and exemplary damages against the individual Defendants, jointly and severally, in an amount to be proved at trial;

1        4.     For reasonable costs, expenses, and attorneys' fees pursuant to

2    42 U.S.C. § 1988 and any other applicable law; and

3        5.     For such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

5        Plaintiffs demand a trial by jury on any and all issues triable by a jury.

7    Dated:    May 29, 2020          ARTURO J. GONZALEZ
                                   JESSICA L. GRANT
                                   ROBERT S. SANDOVAL
                                   MALLORY MORALES

                                   MORRISON & FOERSTER LLP

                             By:    /s/ *Jessica L. Grant*
                                          Jessica L. Grant
                                          Attorney for Plaintiffs